Good morning, Counsel. Good morning, Your Honors. Steve Hubachek, Robin Skeller, on behalf of the plaintiffs. Your Honors, I'd like to reserve three minutes for rebuttal. All right, watch your time. Thank you, Your Honor. Your Honors, I'd like to first address briefly the Rule 9 v. Rule 8 issue. The cases that are relied upon by the District Court and the defendants, Rubke, Rigel, Stack, and Dayal, are all cases where the Section 11 statements are also Section 10 statements. But in the third amended complaint, that's not the case anymore. The Section 11 statements are no longer Section 10 statements. And, in fact, as was pointed out in Dayal, in this case there is negligence alleged. So I don't think that the Rule 9 analysis applies to any of the Section 11 claims. And to the extent that it did, in any event, in Vest v. Siba-Geigy, what you're supposed to do is to strike out the fraud allegations and figure out what you have left and whether or not that's sufficient. And we think that all of these claims are sufficient based on that analysis. The District Court was really focused on the allegation in the second amended complaint about the use of the IPO to raise money for the defendants. If you strike that out, the Section 11 claims are still sufficient. So, of course, we believe that they're sufficient under 8 and 9. So I'd like to proceed to the individual Rule 11 claims now. Now, Your Honors, with respect to the first claim, we've got a statement from Matricity saying that Matricity delivers a highly personalized mobile Internet experience to approximately 35 million consumers. And then below that heading there are three indented bullet points, the third of which is the entire Internet through a mobile optimized experience. So that's a representation that not that the carriers are getting the entire Internet themselves alone, but also that 35 million consumers were. And that statement is simply false. Now, the District Court's analysis of that statement focused on various statements in the registration statement, not one of which ever said that the 35 million consumers are not getting access to the entire Internet. And if I could just give just a few examples. Counsel, before we leave that, though, didn't the registration statement also inform the public that the mobile data provider industry was changing rapidly and that smartphones were increasingly entering the market and providing the same type of service? Why doesn't that negate any misrepresentation on the part of the statements that you read? Because it doesn't go to what the misstatement is. The misstatement is that the 35 million customers through Matricity's product are getting access to the entire Internet. The fact that there was competition between the carriers that Matricity served and the smartphone manufacturers doesn't tell people that the competition is based upon the lack of Internet access on the part of the carrier's customers. It doesn't tell them that at all. They could be competing on any number of things. I mean, cars compete all the time, but they don't compete on what roads they get to drive on. So people aren't necessarily going to know from the mere fact that there's competition that the Matricity carriers are basically fighting with one hand behind their back because of a lack of Internet access. And again, that type of statement is one from which a potential investor would have to make an inferential leap from there is competition to it must be on the fact that there's not Internet access. But again, we're trying to counteract, or they're trying to counteract, a specific representation in the registration statement itself that says that, hey, the 35 million people are getting access to the entire Internet. That's why statements like actual user interfaces vary in appearance doesn't tell anybody that they vary in Internet access. To say that an experience is customized doesn't say that it's compromised as to Internet access. To say that it's a carrier-branded experience doesn't say that it's a carrier-limited experience. In every single one of the statements that the district court relied upon, you can do that exact same analysis. They have this functionality. They can take this in. They can take that out. They never say that what's taken out is access to the entire Internet, which they would need to do very specifically to counteract the specific representation that they've made. So, Your Honor, I don't think that any of those disclosures in the registration statement counteract that very specific statement. Well, you claim your security acts claimed that you were required to meet the pleading standards of Rule 8, right? Yes, Your Honor.  Yes, Your Honor. All right. You allege in your complaint that the defendants engaged in a scheme to defraud investors by failing to disclose known adverse facts about motoricity in order to enable the company's principal shareholders to sell $11 million worth of their own stock at artificially inflated prices. So what misrepresentations or omissions underlying your securities acts claims are separate and distinct from this scheme? Well, first of all, in the... It just seems that you've got one scheme going on, and the district court then held you to Rule 8, right? Held us to Rule 9, yes. Rule 9, I'm sorry. Yes, Your Honor. The point is, Your Honor, is that in the third amended complaint, there is no incorporation in the Section 11 claim of any allegation like that, Your Honor. It's just not done. So these claims are in a situation where they're separate, and we've actually alleged that the preparation of the registration statement was negligent. So we're not making that claim as to the Section 11 statements. And that type of situation is not what you have in the cases that the district court relied upon, you know, like Dow and Rubke and Rigel and Stack. In those cases, there was no differentiation, but here we have that. So I think that serves to distinguish. Well, okay, but so it was negligent not to put in about the lack of Internet access? It seems to me you're claiming that's fraudulent. No, we're claiming that it's negligent. We have basically cordoned off those Section 11 statements in the third amended complaint. But then isn't it fraudulent later? Isn't that part of your claim of fraud? There are later statements that are made after the registration statement that are made between that and the ultimate failure of the various contracts. So, yes, there are statements that are alleged later on, but we have, as we're entitled to do, differentiated these with respect to Section 11, which basically eliminates the analytical basis of the cases that the defendants and the district court have relied upon. But if the same statements are relied upon for the negligence and the misrepresentation claims, you would agree that 9A would apply, wouldn't you? Well, Your Honor, I think 9A, subject to Vess v. Siba-Geigy, which is not easy to pronounce, that actually says that what you do is the second stage analysis. But in the third amended complaint, the Section 11 statements are not alleged as Section 10 statements. So that factual predicate simply doesn't exist. If I may, I'd like to move on to the second Section 11 statement, which is the one regarding the Item 303 disclosure. In this instance, Defendant Wirch was asked about, quote, a little bit of a shift going on between who owns the customer, whether it be the device manufacturer that sells or the service provider, and that's at paragraph 38 of the third amended complaint. And then the response to that was, about 14 months ago, we started seeing the shift happen, and quite dramatically, in a smartphone business. Now, the district court read that as not being a statement regarding what was known in the past, because 14 months ago would put that six months ahead of the registration statement, meaning that in January of 2010, they were aware of this dramatic shift. But with all due respect, that's not a reasonable reading of this statement. About 14 months ago, we started seeing. So about 14 months ago, a past tense predicate started seeing, and then what they started seeing was the shift happen, which references the initial question, and then the shift is dramatic. Now, Item 303 and this court's decision in Stackman make clear that if there's a trend that has the potential to have a significant material effect, it has to be disclosed. They didn't disclose any dramatic change in the ability of their customers, i.e., the carriers, to keep a hold of the customers in this cell phone market. So that's undisclosed, and, in fact, Stackman makes clear that if the statement, if the trend has the potential to create an erosion in the registrant's market share, that that's material and must be disclosed. So the district court's entire analysis on this claim was basically to say that it didn't refer to the past. But we're entitled to have the complaint read in our favor, and that clearly reads in the past, we started seeing 14 months ago. So that's the second Item 303 claim, and then, excuse me, the second Section 11 claim, and then the third Section 11 claim is that defendants claim that they had a flexible, modular architecture that enables them to deliver a highly scalable and highly reliable carrier-branded experience. Again, that's not true either. We've got the confidential witness one that says that, in fact, it wasn't a flexible, modular structure. It was seriously rewritten both for AT&T and then later on extensively and at great expense for Verizon. So the flexible, modular aspect no longer existed, and that was important to investors because they knew that there's this contract with XL Oxiata, and they needed to do customization in order to fulfill that. But they're in a situation where it was far, far more difficult for them to do that because they didn't have a flexible, modular product anymore. They had one that would be extensively rewritten and would require extensive revisions again. So that would have been very important to investors, clearly contradicted by CW1. So that's the third Section 11 claim. So are these allegations that you're putting forth to rebut that motricity was on track? Your Honor, that's a separate claim, and I'll go to that one right now. There are also statements from motricity that they were on track with respect to the XL Oxiata contract. Now, on-track statements are not always considered to be sufficient, and the District Court found they were vague. So I just want to briefly address the fact that those statements were made in response to very specific questions in analyst conferences regarding whether or not there were delays, whether or not things were moving forward, and the defendants, particularly in the August 9th and November 12th statements, responded to these questions about whether there were delays or problems in that contract by saying that they were on track. So we're not talking about this sort of amorphous discussion in a case like Avaya where you're talking about with respect to their projections. Now, if they were false at the – they have to be false at the time they were made, right? That's correct, Your Honor. It can't just be a hindsight analysis. That's correct. But what we have here is a situation where, for instance, the last statement was made on November 12th. As of December 31st, the XL Oxiata contract was canceled, and that's just a month and a half later. As of January 19th, all of their Asia contracts are canceled, and as of January 24th, XL Oxiata announces that its subscribers can now use an entirely different service. Now, under Reese v. Malone and the Fifth Circuit's decision in Plotkin and the Second Circuit's decision in MF Global, courts can infer from something that happened, you know, so quite recently after the statements were made that, in fact, the statements were false when they were made and that they were made with Cyanar. In addition to the Cyanar, we also have the fact that this was a crucial aspect of their business. So the core operations inference supports an inference of Cyanar, as well as the fact that there were insider sales under Kaplan v. Rose. The fact that five senior executives, they sell their stock, is that circumstantial evidence of Cyanar? Yes, it is circumstantial evidence, and Kaplan v. Rose supports that. It's never been overruled. And I think if you look at the analysis in South Ferry, it talks about looking back at case law from prior to the PSLRA and saying, well, you know, we can still consider that, and there's no reason that this court can't and no case has held that it cannot. Your Honors, I see that I have two minutes. May I retain those for rebuttal? You may. Thank you, Your Honor. Okay, where's the button? Found it. Good morning, Your Honors. Good morning. Thanks for coming up north from down south and bringing some 70 degree plus weather. It was our pleasure. Unusual for Seattle. Your Honors, my name is Stelman Cannell. I'm an attorney at DLA Piper, and I represent the motricity defendants. Also here today is Mr. Hamill, who's going to speak for the underwriter defendants. So roughly I'm going to try to leave him around five minutes to back clean up. So are you prepared to talk about the registration statement? I am, Your Honor. All right. Well, I think that's where the appellant's counsel started, and at the beginning of the registration statement, there's a full page advertisement with color graphics and everything. We power the mobile Internet, an entire Internet through a mobile optimized experience, and then 90 pages later, there's something that explains that MCOR service delivery platform enables wireless carriers to design, configure, customize, and implement mobile data services. So your earlier statements about carrier customization don't seem to be as explicit as this statement. Why should we accept that a disclosure buried in the registration statement is fair notice to a reasonable investor that it was possible for a subscriber not to have unlimited access to the Internet? Your Honor, to begin with, every word of the registration statement has to be read, and it has to be read altogether. So the fact that something's on page 18 versus page 80 doesn't really matter here. It's a legal document, and it's got to be read in its totality. Now, I think probably the most clear disclosure that really says what plaintiffs are saying the registration statement doesn't say can be found on page 83 of the registration statement. It's ER 283. That's where Motricity says, let's step back a step. What is plaintiff's complaint really all about? It's really about you guys are being overtaken by smartphone, and you're not going to be able to sell all this stuff to the carrier customers because the carrier customers have to go through the carrier through their portal, and now smartphone has come along, and you can escape that whole route, and you can go directly to the Internet. That is what much of the registration statement talks about. It decries the fact that smartphone is making advances. It talks about the fact that there's been a 100% increase in two years in smartphone absorption. It went from 6% in 2007, 9% in 2008, to 12% in 2009. In other words, it had doubled in two years. At that rate of growth, it's going to go exactly where we saw it go. And much of the registration statement is saying smartphone isn't our system. That's an open system. Remember, that's the phrase that's used several times in the registration statement, that under smartphone you get open access to the Internet. Here's how Motricity described its system, which is the opposite of that. We also provide various, this is a quote. It's on page 83. Are you still on page 283? 283, Your Honor. It's right in the middle of the page. It's the second paragraph under the title, Our Strengths. Okay. It says, we also provide various interfaces to enable our wireless carrier customers to directly manage the content and presentation of their mobile data service experience. So how does that negate the inference that the customer has access to the entire Internet? Well, to begin with, what we say is you get access to the mobile Internet, which is different, of course, from the total Internet. I thought you said we power the entire Internet. We say mobile Internet, Your Honor. Mobile Internet. Yes, mobile Internet. It's different. It's different. Okay, it's different. So by using the word mobile in there, what are you? But let's come. Could I ask my question? Sure, Your Honor. By using the word mobile in there, are you saying that that's a disclaimer? It is a definition, and we explain in here that by mobile Internet you don't get full access because unless the sites have actually powered access, you'll recall, this is just well known with anybody that had a cell phone, which I guess most of the nation did at the time of this IPO, if you tried to get an Internet site and it wasn't mobile activated, you couldn't get the Internet site. So someone is supposed to, an investor is supposed to know that from reading the word mobile? The investor actually is told that. We actually say in the prospectus that it depends upon whether, you know. In the registration statement. Yes, in the registration statement. Where in the registration statement does it say that? Actually throughout, Your Honor, in distinguishing the mobile Internet. But to come back to your first question, which I never answered, and I don't want to dodge your question, you asked how does the sentence, Mr. Connell, you read originally, show that there has been some limitation? Your Honor, you can't manage the content and presentation and that somehow expands what you're going to get. Obviously it's some delimiting factor, right? In some way it's different from the open access. A fair reading here, where if an investor took the time to actually read all of this, which the investment community actually does, you could not escape the conclusion that the Motricity system is a carrier-fed system going through a portal in which content is managed. And that is in contradistinction to the smartphone system, which is coming on strongly and has completely open access. And you'll recall that in the registration statement, what Motricity says is if our carriers don't start responding to this threat, customers are not going to find it as compelling, and they're going to go the smartphone route. And indeed, that's exactly what befell the industry. Just so I understand your position, you're saying that the registration statement that the entire Internet, through a mobile optimized experience, does not represent to be access to the entire Internet. And indeed, Your Honor, here's... Is that a yes or a no? It's a yes for two reasons. One, because we explain exactly how the system works when you get into the entirety of the registration statement. But moreover, we never say that our customers have to give the entire Internet. What we say is we make available to our customers, what we say in the page, the much heralded advertisement, which isn't even a number page, it's just a glossy before you start the text. But it counts. It counts, absolutely. We're not running away from it. What it says is that we give entire Internet access through a mobile optimized experience. That is what we give to our customers. Who are our customers? The four big wireless carriers, AT&T, Verizon, T-Mobile, and Sprint. And we disclose that. Our customers aren't the 35 million people who have subscribed to their services. Those are customers of the carriers. Our only customers are wireless carriers. And what we say is we make available to them complete access to the Internet. And we do. That's not a statement that plaintiffs challenge. Every time plaintiffs talk about there being a limited experience, what they're saying is as limited by the carriers. They understand and do not plead that Motricity did anything less than provide the carriers complete access to the Internet. And then it was up to the carriers, as the registration statement says, what are you going to make, Mr. Carrier, available to your customers, the subscribers? And what the registration statement ultimately makes clear, if you do a thorough reading, is what our customers are doing, the carriers, is limiting that access because they're cutting off, for example, adult websites. And the result is it's different from the smartphone experience. But ER 199 appears to purport to be to the direct consumer because it says, Motricity delivers a highly personalized mobile Internet experience to approximately 35 million consumers. You don't say through carriers. You say to the consumers. Your Honor, ultimately the consumers are beneficiaries of the mCore product. That's not what this says. It says we deliver to approximately 35 million consumers, not indirectly. Yes, but the fact is the registration statement read in its totality, and I'm not asking you to read every word, but maybe your law clerk will have to. When you read the registration statement in its totality, they will tell you in chambers. They will say, yes, Mr. Connell is right. Motricity does make it clear. I'm not sure about that. I think they will say that. They will say Motricity makes clear in the registration statement that their actual customers are the carriers. I think it was a little disingenuous for you to try to limit the registration statement only to the carriers when it specifically says here on this page that it's to the consumers. Ultimately the consumers get the benefit. We don't quibble with that. That is true. But they get it through the carriers, and a complete reading of the registration statement makes it clear. Let me touch on a couple of other points in a few seconds. Before you do, what do you do with your opponent's argument about discovery, disclosing that there were trends and erosion of the customer database 14 months before the IPO was issued? Well, the principal response there on the known trend is that the disclosure is made. I know we talk a lot about the brief of what did Mr. Wirtz really mean when he said, long after the IPO, that we started seeing a trend 14 months before. But the bottom line is this. ER202, page 2 of the registration statement, we say that smartphones, quote, are capturing an increasing portion of the market, close quote. Very clear. So the plainest point is you guys should disclose that there's an adverse trend. Page 2, we disclose the adverse trend. Not only do we do that, we gave the Yankee study to potential investors, saying they went from 6% to 9% to 12%. Anybody who can do math, and all of us can do this simple math, it shows that this is a really dangerous trend. So the disclosure was made. I don't think it's even worth quibbling about trying to parse what Mr. Wirtz said. The fact is I think a fair reading of what he said is we started to see a trend slightly before the IPO, but there's nothing in his statement that says we found the trend at that point. You know, before the IPO, we didn't find the trend at that point to be the skyrocket that it ultimately became. I mean, everybody in the industry later said, here's the crazy thing. You know, everybody knew exactly how the industry worked because putting aside what's in the registration statement or is not in the registration statement, the carriers posted on their websites, and Judge Zilley probably took judicial notice of this, the carriers posted on their websites that were limiting access to our customers. This would be the craziest fraud and the craziest way to trick the investment community one ever heard of when you've got it posted on the web all over the place in excruciating detail how the system works and the market absorbs all that information. It's a crazy notion that there's some scheme of fraud going on here, but that's what plaintiffs allege. That's one reason Rule 9b applies here. If the court were going to write a published opinion in this and you want to grapple with the 9b versus 8a, I think what you could focus on is there's a common nucleus of facts here. What are plaintiffs challenging? They're saying, Motricity, you lied to us about what your capabilities were. And whether they put that in the Rule 11 claims or the 10b claims, that's still what they're saying. You lied to us. I have to honor my commitment to my fellow traveler here, Mr. Hamill, so I'm going to turn over, but I'm happy to answer any questions if the panel would like to hit me with them. Thank you, counsel. Thank you. May it please the court, Jeff Hamill for the underwriter defendants, and I appreciate the indulgence of allowing me to speak. So are there any arguments raised by Motricity that you do not join? Well, we only face the Section 11 claim, Securities Act claim. But any of the arguments that they made, do you disagree with any of their arguments? We do not disagree with any of their arguments. I was going to hopefully just point the court to make a few points since I don't want to waste the court's time. I heard plaintiffs' counsel, both here and in their briefs, rely heavily for the Rule 8-9 distinction on the Vest case. I would just point out to your honors that the Vest case is not a securities case. It's a California Consumer Legal Remedies Act case, and I'm not sure it speaks either to the law or to the alleged facts here where quite clearly what we have is allegations of misrepresentations on the same subject matter, beginning with the registration statement and continuing thereafter during the class period, which if that's not a unified course of conduct under this court's law, I'm not sure what is. That's point one. Point two is that I'm not going to repeat what my colleague said about the disclosures, but the registration statement is crystal clear that Motricity's customers, the ones to whom they directly sell their product are the wireless carriers. That's at ER 201. Our customers include four of the top ten wireless carriers, it says, and it names them. The registration statement then makes clear, and this is at ER page 202, the wireless carriers can select from some or all of our services to construct and deliver a customized product. And so I believe it's quite clear that the registration statement discloses that we sell our product which is undisputed, delivers the complete Internet to the wireless carriers. Judge Zille found in his 50-page opinion dismissing the second amended complaint, this is at page ER 19 of the record, that the plaintiffs have never disputed that the product delivers the entire Internet to the wireless carriers. Then the registration statement discloses that the wireless carriers implement it as they see fit. And so while the disclosure may not be perfect, certainly in the white-hot glare of litigation six years later, the securities laws don't demand perfection in disclosures, they demand reasonable disclosures, and I believe the disclosures I've pointed the court to are reasonable. My third and next to final point is the item 303 point. This has to do with the adoption of smartphones. Much is made in the briefing about the statement by the CEO in March of 2011. One, that's post the IPO. And the plaintiffs try to take that statement to show that the CEO was admitting that prior to the IPO, he knew that there was a dramatic shift in the smartphone adoption rates. If you actually read what the CEO said, and that is in the record, and that's at pages ER 811 and 812, the quote is not accurate as quoted by the plaintiffs, and the court can take a look at that. But I believe that if you read the quote accurately and in context, it cannot be interpreted even on a motion to dismiss, giving the benefit of the doubt to the plaintiffs that the CEO is admitting that at the time of the IPO, they knew of these rates. That's just not accurate. And finally, Your Honors, last point on this Excel contract. I'm sorry, may I go on? Yes. Last point on the Excel contract. Their point is that the product was not sufficiently scalable, and that's why it wasn't profitable to have this Asian contract. At page ER 220, it's disclosed that our international experience was limited, that it was going to take a great deal of time and customization and expense to do that, and so consumers were fully on notice, or investors were fully on notice, that this project could be, you know, much more expensive than anticipated. And with that, I'll sit down if the panel has no more questions. All right. Thank you, counsel. Rebuttal. Thank you, Your Honor. I'd like to start with the IPO comments first. I agree that Your Honor should look at exactly what was said, and what you'll see is it's not a statement that referred to the time of the IPO. It's a statement that refers to six months before the IPO. And counsel says that, you know, that the problem with the competition was already disclosed, but no dramatic shift was disclosed. And that's the point here. There's a dramatic shift. Item 303 requires trends. This is a new trend that they started seeing six months before the IPO, and it had a serious potential to erode their business. So that's with respect to the IPO. Counsel has suggested that the court should look beyond the registration statement, but this court's decision in Miller v. Thain says that you don't do that. And, in fact, if you look to footnote 2, which is appended to the statement that we've quoted, they draw a distinction between fraud on the market type, Section 10b-5 cases, and Section 11 cases. Because Section 11 cases don't involve the fraud on the market theory because reliance is presumed in Section 11 cases. So you don't look beyond the registration statement. Investors are entitled to look at this registration statement and evaluate whether or not they're going to invest in a particular offering. A lot of the things that were said in counsel's presentation, and I think Judge Rawlinson pointed out at least one of them, basically add things to the various disclosures. And that's really the entire theme of this case. If you look at the district court's order, it's the same thing. He'll quote something that was said in the registration statement and then conclude that this tells people that the entire Internet was not going to the customers or the carriers, but it never actually says that. So when they say that manage means that it limits the entire Internet, it doesn't say that, but it very explicitly says in big, bold letters in the front of the registration statement that that's exactly what they do, and that's why this violates Section 11. Unless Your Honors have any further questions, I'll submit. Thank you, counsel. Thank you to both counsels. Excellent arguments. The case just argued is submitted for decision by the court.
judges: Hawkins, Rawlinson, Callahan